2014 UT App 265

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Plaintiff and Appellee,
*v.*
ROBERT DAMIEN THORNTON,
Defendant and Appellant.

Opinion
No. 20121086-CA
Filed November 14, 2014

Third District Court, Salt Lake Department
The Honorable Katie Bernards-Goodman
No. 111900297

Debra M. Nelson and Brenda M. Viera, Attorneys
for Appellant

Sean D. Reyes and Karen A. Klucznik, Attorneys
for Appellee

JUDGE JOHN A. PEARCE authored this Opinion, in which JUDGES
GREGORY K. ORME and MICHELE M. CHRISTIANSEN concurred.

PEARCE, Judge:

¶1 Robert Damien Thornton appeals from his conviction of three counts of rape of a child, three counts of sodomy on a child, three counts of aggravated sexual abuse of a child, and one count of witness tampering, all of which resulted from his alleged sexual abuse of his roommate's twelve-year-old daughter (Child). Thornton argues that the district court erred by excluding evidence of Child's other sexual activity and by admitting evidence that Thornton had supplied Child's mother (Mother) with drugs and encouraged Mother to prostitute herself. We determine that the district court properly excluded testimony concerning Child's other sexual activity. However, we conclude that the district court

abused its discretion by admitting the evidence of Thornton's prior bad acts without scrupulously examining and balancing the probative value and prejudicial effect of that evidence. We reverse Thornton's convictions and remand for further proceedings.

BACKGROUND

¶2     In 2010, Child lived with her stepfather and Mother in a two-bedroom residence.[1] Around October 2010, Child's stepfather was incarcerated. Thornton and his girlfriend then moved in with Child and Mother and began to live in Child's bedroom.

¶3     Mother had suffered from chronic pain throughout her life and would visit a methadone clinic every morning for treatment. When Thornton moved in, he agreed to provide Mother crack cocaine as rent, which fed Mother's substance abuse problem. As Mother's dependency increased, Thornton told Mother that she needed to make money to pay for the drugs he was giving her. Thornton proposed that Mother prostitute herself. Mother did so. Mother would often bring clients home and conduct her business while Child was in the home. As Mother's drug addiction intensified, she increasingly neglected Child. Child went some days without eating. Although Child had been a straight-A student, she stopped attending school.

¶4     In early November 2010, Thornton's girlfriend was incarcerated, and his relationship with Child changed. Thornton

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Bluff*, 2002 UT 66, ¶ 2, 52 P.3d 1210 (citation and internal quotation marks omitted). However, in light of our reversal of Thornton's convictions, we emphasize that many of the facts presented are more accurately described as allegations that have yet to be established by a valid jury verdict.

began giving her "creepy looks" and patting her on the buttocks. One morning, while Mother was at the methadone clinic, Thornton either lured or dragged Child into her bedroom and had sexual intercourse with her while holding a pillow over her face. Child tried to fight Thornton off but could not do so. Child later testified that "[i]t hurt really bad" like she "was being ripped open." She also testified that Thornton ejaculated, that it "stung really bad" when she urinated afterward, and that there was "white gooey stuff" in her urine. Child testified that she initially did not tell Mother about Thornton's abuse, in part because Child did not think Mother would care due to her drug abuse and because Thornton threatened to kill Child and Mother if Child revealed what he was doing to her.

¶5     Over the next two months, Thornton had sex with Child almost every morning when Mother went to the methadone clinic. Thornton forced Child to perform various sex acts that would eventually form the basis of the charges against him. Child initially tried to stop Thornton, but she soon gave up. Thornton became more attentive to Child and would give her gifts, and Child began to think of their relationship as a "boyfriend/girlfriend type of relationship." When Mother attempted on several occasions to kick Thornton out, Child convinced her to let him stay. Child also wrote several notes to Thornton expressing her love for him, at least one of which expressed her belief that he had impregnated her.

¶6     On the morning of December 31, 2010, Child told Mother that Child thought she was pregnant by Thornton. Mother confronted Thornton, who responded by insulting Mother and telling her that she would never be able to see the baby. Thornton then told Mother that he was going to sit down and wait for the police to come and arrest him. Mother went to a neighbor's house, and the police were called.

¶7     The police arrested both Thornton and Mother on outstanding warrants. Child was taken to a group home. Child denied Thornton's sexual abuse during her first interview with a detective, explaining that Thornton was old, ugly, and looked like "a hobo." After that interview, Child's protective-services case

worker informed Child that Thornton was in jail. At that point, she agreed to meet with the detective again. In her second interview, she told the detective that Thornton had been having sex with her.

¶8     On January 19, 2011, a family nurse practitioner examined Child and determined that her hymen was intact. However, the nurse also noted that, due to her physical maturity level, Child's hymen was elastic such that penetration would not necessarily have caused injury. The examination did not include the completion of a rape kit, because of the time that had elapsed since the last sexual interaction between Child and Thornton. The nurse practitioner conducted a pregnancy test, which indicated that Child was not pregnant.

¶9     Forensic testing of clothing recovered from Child's room revealed seminal fluid bearing Thornton's DNA. Investigators were unable to detect Child's DNA on the clothing. Thornton had previously admitted to police that he had engaged in sexual activity in Child's room while living there, but he denied any sex with Child.

¶10    The State brought multiple charges against Thornton arising from Child's allegations. The case has been tried three times. Before each of his three trials, Thornton moved to admit evidence that Child had been sexually active with another individual during the same time period that Thornton was accused of abusing her. This evidence included Child's statements from the preliminary hearing that she had been having sex with a male friend and that Mother knew about it and did not approve. Thornton sought admission of the evidence to show an alternate source for Child's belief that she was pregnant and to rebut the inference that a jury might draw that twelve-year-old Child was a sexual innocent lacking "advanced sexual knowledge." Four different district court judges considered Thornton's motion over the course of the three trials. All four judges denied the motion pursuant to rule 412 of the Utah Rules of Evidence.

¶11    Before the first trial, the parties agreed to exclude the evidence that Thornton had supplied drugs to Mother and had

encouraged her to prostitute herself to pay for them. Nevertheless, Mother testified that she "was not a prostitute until [Thornton] moved into my house . . . and told me how to do it." Thornton moved for a mistrial, arguing that Mother's testimony violated the parties' pretrial agreement. The district court agreed and declared a mistrial.

¶12 The parties entered into a similar stipulation before the second trial, again agreeing to exclude evidence of Thornton's other bad acts involving drugs and prostitution. After the second trial ended in a hung jury and the resulting declaration of another mistrial, the State decided that it needed to introduce the drug and prostitution evidence. The State sought to admit the evidence pursuant to rule 404(b) of the Utah Rules of Evidence, arguing that "the jury need[ed] to know what was actually going on in that home" to explain why Thornton was in the home, why he was alone with Child so often, and why Mother did not kick him out despite his abusive behavior. The State explained,

> There is this huge gap, all of these questions as to why. Why was this happening? Why was [Mother] allowing this situation? It creates this gap that the jury starts—the jury is going to wonder, the jury is going to start to speculate and fill in what was going on.

The State further represented that, based on its interviews of the jurors from the second trial, "that's exactly what happened at the last trial and why it was a hung jury."

¶13 The district court granted the State's motion after the State clarified that it was not going to use inflammatory language such as "pimp" or "crack-dealer." The district court instructed the jury that the evidence was to be used only "for the limited purpose of determining Defendant's position of power or trust in the household or in understanding the victim's behavior" and that it was not to be used as a separate basis for punishing Thornton or to evaluate his character.

¶14    The third jury convicted Thornton on all counts. Thornton appeals his convictions.


ISSUES AND STANDARDS OF REVIEW

¶15    Thornton argues that the district court erred by excluding evidence of Child's sexual history, asserting that the evidence was admissible under rule 412 of the Utah Rules of Evidence and that its exclusion violated his constitutional rights. "We review the trial court's underlying evidentiary determinations for abuse of discretion, but the alleged [d]enial of the right to confront and cross-examine witnesses presents a question of law which is reviewed for correctness." *State v. Denos*, 2013 UT App 192, ¶ 12, 319 P.3d 699 (citation and internal quotation marks omitted).

¶16    Thornton also challenges the district court's admission of evidence that he had supplied drugs to Mother and encouraged her involvement in prostitution. "A trial court's admission of prior bad acts evidence is reviewed for abuse of discretion, but the evidence must be scrupulously examined by trial judges in the proper exercise of that discretion." *State v. Verde*, 2012 UT 60, ¶ 13, 296 P.3d 673 (citation and internal quotation marks omitted); *see also* Utah R. Evid. 404(b) (governing the admission of evidence of "crime[s], wrong[s], or other act[s]").


ANALYSIS

I. Evidence of Child's Other Sexual Activity

¶17    Thornton challenges the district court's exclusion of evidence regarding Child's other sexual activity. Thornton asserts that Child's sexual relationship with a male friend overlapped the time period she alleges Thornton abused her.[2] On appeal, Thornton

---

2. The evidence partly consisted of Child's preliminary hearing testimony. The district court had allowed limited questioning about

(continued...)

argues that this evidence should have been admitted under rule 412 of the Utah Rules of Evidence, which governs—and generally prohibits—admission of evidence that a victim has engaged in other sexual activity. *See* Utah R. Evid. 412.

¶18    Thornton contends that the evidence of Child's sexual history qualifies for admission under two exceptions contained in rule 412. First, he argues that the evidence is admissible to demonstrate that someone else was "the source of semen, injury, or other physical evidence." *Id.* R. 412(b)(1). Second, he argues that the evidence must be admitted because its "exclusion would violate [his] constitutional rights." *Id.* R. 412(b)(3).

A.    Alternate Source of Physical Evidence

¶19    Rule 412(b)(1) states that the district court "may admit the following evidence if the evidence is otherwise admissible under these rules: (1) evidence of specific instances of a victim's sexual behavior, if offered to prove that someone other than the defendant was the source of semen, injury, or other physical evidence." *Id.* R. 412(b)(1). "Where the prosecution has directly or indirectly asserted that . . . physical evidence originated with the accused, the defendant must be afforded an opportunity to prove that another person was responsible." *Id.* R. 412 advisory committee note (citing *United States v. Begay*, 937 F.2d 515, 523 & n.10 (10th Cir. 1991)).

¶20    Thornton argues that the evidence of Child's sexual activity was admissible under rule 412(b)(1) to show that someone other than he was the source of Child's belief that she was pregnant and to explain how she could provide graphic descriptions of sexual acts. Child testified that she first reported Thornton's abuse to Mother because Child believed that she was pregnant with

---

2. (...continued)
Child's other sexual activity at the preliminary hearing, apparently based on defense counsel's representation that the questions went to "identification issues." We have not been asked to review the propriety of that questioning.

Thornton's child.[3] Thornton argues that Child's belief that she was pregnant constitutes "physical evidence" under rule 412(b)(1), and that the district court should have allowed evidence of Child's other sexual activity to show an alternate source for Child's belief. Thornton also asserts, without explanation, that Child's "advanced sexual knowledge" was physical evidence falling within the rule 412(b)(1) exception.

¶21    We agree with the State that neither Child's pregnancy belief nor her sexual knowledge constitutes "semen, injury, or other physical evidence." *See id.* R. 412(b)(1). By its plain language, the rule 412(b)(1) exception operates only as a mechanism to challenge the source of *physical* evidence. *See Burns v. Boyden*, 2006 UT 14, ¶ 19, 133 P.3d 370 (stating that court rules should be interpreted "according to their plain language"). Thornton has not directed this court to any authority that stretches the language "semen, injury, or other physical evidence" to include mental states such as a victim's belief that she is pregnant or her knowledge regarding sexual matters. Nor has he provided reasoned argument as to why the plain language of rule 412(b)(1) should be interpreted to include the belief or knowledge at issue in this case. In the absence of either authority or reasoned argument to support a conclusion that Child's belief or knowledge constitutes physical evidence, we reject Thornton's argument. *See id.*

B.    Constitutional Requirements

¶22    Thornton further asserts that the district court should have admitted the evidence of Child's other sexual activity because it constituted "evidence whose exclusion would violate [his] constitutional rights." Utah R. Evid. 412(b)(3). Specifically, Thornton posits that admission of the evidence was required to vindicate his constitutional rights to conduct reasonable cross-examination and present a complete defense. *See State v. Marks*, 2011 UT App 262, ¶ 13, 262 P.3d 13 (stating that the United States

---

3. We note that there is no indication in the record that Thornton attempted to exclude evidence that Child believed she was pregnant.

Constitution "guarantees criminal defendants a meaningful opportunity to present a complete defense," which "includes the right to conduct reasonable cross-examination" (citations and internal quotation marks omitted)).

¶23 Thornton contends that he had a constitutional right to present evidence that Child was not a "sexual innocent" who would be unable to describe graphic sexual details unless her accusations against Thornton were truthful. *See generally id.* ¶¶ 33–43 (discussing the "sexual innocence inference" that children lack knowledge about sexual matters and are therefore incapable of fabricating detailed allegations of sexual acts). Thornton argues that the sexual innocence inference bolstered Child's credibility and that he was entitled to use her other sexual activity to attack that credibility, to explain her advanced knowledge of sexual matters, and to explain her ability to give "explicit testimony regarding physical sensations" she allegedly experienced during sex with Thornton. Thornton also claims that the State took advantage of the district court's exclusion of the rule 412 evidence by relying heavily on the sexual innocence inference to obtain his convictions.

¶24 "Utah, like most other jurisdictions, recognizes the relevance of the complainant's past sexual conduct to rebut the sexual innocence inference in appropriate cases." *Id.*, ¶ 36. "However, as with the introduction of sexual activity evidence generally, its admission for purposes of rebutting a sexual innocence inference is highly dependent upon the facts and circumstances of the particular case." *Id.*

> In most cases, "the probative value of evidence of a child's alternative source of sexual knowledge will . . . be inversely proportional to the child's age, for the younger the child, the stronger the likelihood of a jury inference that the child would be too sexually innocent to have fabricated the allegations against the defendant."

*Id.* ¶ 37 (omission in original) (quoting *State v. Molen*, 231 P.3d 1047, 1052 (Idaho Ct. App. 2010)).

¶25     Here, Child was twelve years old at the time she made her initial allegations against Thornton. Thornton argues that this court has, in two cases, acknowledged that "'[t]he average juror would perceive the average twelve-year-old girl as a sexual innocent.'" *Id.* ¶ 35 (quoting *Butterfield v. Cook*, 817 P.2d 333, 339 (Utah Ct. App. 1991)). However, in both of those cases, the language characterizing twelve-year-old girls as sexual innocents does not represent the court's holding but instead describes how another jurisdiction has applied the sexual innocence inference.[4] We do not read either case as standing for the proposition that a jury will always consider a twelve-year-old to be a sexual innocent.

¶26     Regardless of the sexual knowledge a jury might be willing to impute to today's average twelve-year-old, the issue before us is whether the district court erred in excluding evidence of Child's sexual activity under "the facts and circumstances of [this] particular case." *Id.*, ¶ 36. We conclude that the district court did not err in excluding the evidence. The relationship between the proffered evidence and the possible inference that Child was too sexually innocent to have fabricated her allegations is not such that excluding the evidence violated Thornton's constitutional rights.[5]

---

4. The original language regarding "the average twelve-year-old girl" comes from *State v. Howard*, 426 A.2d 457, 462 (N.H. 1981). *See State v. Marks*, 2011 UT App 262, ¶ 35, 262 P.3d 13; *Butterfield v. Cook*, 817 P.2d 333, 339 (Utah Ct. App. 1991). The *Howard* court opined on the sexual knowledge possessed by twelve-year-olds more than three decades ago. We need not speculate on the sexual knowledge possessed by today's average preteen to resolve this case.

5. Thornton argues in his reply brief that he should not be faulted for the paucity of evidence regarding Child's prior sexual behavior because the district court prevented him from "exploring or developing detailed facts about [Child's] admitted consensual sexual relationship." However, this court has rejected "the use of a rule 412 hearing to explore [the accuser's] sexual past" and held that "a rule 412 hearing is not a discovery tool." *State v. Clark*, 2009

(continued...)

This is true as to each of Thornton's arguments that admission of the evidence was constitutionally required.

¶27      Thornton argues that the excluded sexual activity evidence was required to rebut the inference that Child was telling the truth about Thornton's abuse because she lacked the sexual sophistication to fabricate her accusations. The district court relied on *State v. Moton*, 749 P.2d 639 (Utah 1988), to conclude that the evidence need not be admitted because Child's exposure to sexual knowledge could be established by other means. *See id.* at 644 (affirming the exclusion of rule 412 evidence because it was "not necessary to establish that [the victim] had the knowledge required to fabricate an accusation against defendant").

¶28      Specifically, the district court observed that Mother "was a prostitute who conducted her business in their home" and that Child "was aware of her mother's conduct." In light of this unusual home environment, we cannot characterize Child as an "average twelve-year-old girl" with regard to her likely knowledge of sexual matters. *See State v. Marks*, 2011 UT App 262, ¶ 35, 262 P.3d 13 (citation and internal quotation marks omitted). We agree with the district court that Child's exposure to Mother's activities makes it unlikely that the jury would have viewed Child as a "sexual innocent." Accordingly, we affirm the district court's refusal to admit the rule 412 evidence to rebut any inference that Child was ignorant of sexual matters.

¶29      Thornton next argues that admission of the evidence was necessary to challenge Child's credibility. To the extent this credibility argument is premised on Child's presumed ignorance of sexual matters, we have rejected that argument above.

---

5. (...continued)
UT App 252, ¶ 28 n.8, 219 P.3d 631 (alteration in original) (citation and internal quotation marks omitted). We note that such questioning would directly conflict with rule 412's purposes of "protecting victims of sexual assault from humiliation" and "encouraging victims to report sexual crimes." *See Marks*, 2011 UT App 262, ¶ 48.

Moreover, Thornton fails to explain how evidence of Child's other sexual activity would otherwise impeach the credibility of her accusations against *him.*[6] *Cf. State v. Quinonez-Gaiton*, 2002 UT App 273, ¶ 18, 54 P.3d 139 ("[R]evealing that A.A. engaged in a sexual act with his stepbrother sheds little or no light, by itself, on why A.A. would be motivated to accuse Defendant, of all the people in the world, of sexually abusing him."). We agree with the district court that the sexual activity evidence was not necessary to challenge Child's credibility and that its admission would have done "little more than damage her integrity among a jury, which is the very problem Rule 412 seeks to address." *See id.* ¶ 18 n.1 ("The avoidance of letting a jury know, more or less gratuitously, that a victim of a sex offense is himself 'no angel' is the very reason for rule 412.").

¶30    Thornton also argues that the evidence should have been allowed to explain Child's ability to describe the physical sensations she had experienced during sex. This argument essentially reasserts Thornton's argument about the sexual innocence inference, recast to apply to Child's knowledge of physical sensations rather than her general sexual knowledge. We also disagree with Thornton's characterization of Child's descriptions as so vivid that they could have resulted only from her personal experiences. While somewhat graphic, Child's descriptions ultimately reflect nothing more than a rudimentary understanding that sex involves penetration and ejaculation. The district court did not abuse its discretion in concluding that the jury could have inferred that Child's knowledge of such basic sexual matters derived from her exposure to Mother's prostitution.

---

6. Thornton advances a theory that Child falsely accused him of having sex with her to conceal her other sexual activity from Mother. But Child testified at the preliminary hearing that Mother already knew that Child was sexually active. Although Child also testified that Mother did not like that Child was having sex, there is no evidence in the record that Mother had threatened any particular consequences that Child might have potentially avoided by fabricating her allegations against Thornton.

¶31    Finally, Thornton argues that his constitutional right to present the evidence is implicated because the State relied heavily on the sexual innocence inference to obtain his convictions. However, Thornton has failed to identify in the record any attempt by the State to employ the sexual innocence inference to bolster Child's credibility below, much less the heavy reliance Thornton asserts. Although the State frequently reminded the jury of Child's age, her youth was an element of each of the sex crime charges against Thornton and a proper matter for the jury's attention.

¶32    The closest the State came to implying sexual innocence based on Child's age was a comment in closing arguments that "this little girl was 12 years old. She is not some sophisticated adult that's thinking about romance novels." This comment was made to rebut Thornton's argument that Child wrote notes to Thornton because she wanted a male figure or father figure in her life. The State's direct response to Thornton's own closing argument does not constitute abusing or taking advantage of the district court's rule 412 ruling to bolster Child's credibility. Thornton has failed to persuade us that the State relied on the sexual innocence inference to such a degree as to require a new trial to vindicate his constitutional rights.[7]

¶33    For all of these reasons, we conclude that Thornton has not established that the evidence of Child's other sexual activity was admissible to show an alternate source of physical evidence or because its exclusion would violate his constitutional rights.

---

7. This conclusion derives from our assessment that the State did not actively exploit the district court's rule 412 ruling. The constitutional calculus would shift if the State had attempted to take advantage of the limitation on Thornton's ability to introduce evidence of Child's other sexual activity by encouraging the jury to infer her sexual innocence or suggesting that Thornton was the only possible source of her sexual knowledge. If Thornton faces another trial and the district court rules on the 412 evidence in a similar fashion, the court should remain vigilant to ensure that the State does not take unfair advantage and should revisit its ruling if the State were to do so.

Accordingly, we affirm the district court's exclusion of that evidence under rule 412 of the Utah Rules of Evidence.

## II. Evidence of Thornton's Prior Acts

¶34   Thornton also challenges the district court's decision to allow the jury to hear evidence that he provided drugs to Mother and encouraged her prostitution.[8] Thornton argues that this evidence should have been excluded under rule 404(b) of the Utah Rules of Evidence because it was offered to demonstrate his bad character and to suggest that he had acted in conformity with that bad character by sexually abusing Child. *See* Utah R. Evid. 404(b) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character."). Thornton further argues that the district court failed to perform the exacting review required before rule 404(b) evidence can be admitted. *See, e.g.*, *State v. Verde*, 2012 UT 60, ¶ 13, 296 P.3d 673 ("A trial court's admission of prior bad acts evidence is reviewed for abuse of discretion, but the evidence must be scrupulously examined by trial judges in the proper exercise of that discretion." (citation and internal quotation marks omitted)).

---

8. Contrary to Thornton's consistent characterizations of this evidence on appeal, neither the prosecutor nor any witness ever expressly referred to Thornton at trial as a "pimp" or a "drug dealer." Child testified that, after Thornton moved in, Mother "became really addicted to cocaine and other drugs" and Thornton provided the drugs to Mother. Mother testified that she began to prostitute herself "to pay for the crack cocaine" and that Thornton had "basically told [her]" to engage in prostitution "to come up with money to pay for the crack." Mother testified that when she received money from her prostitution, she "would give it to Robert Thornton and he would provide me with crack cocaine." While this testimony described Thornton's involvement in the sex and drug trades, it did not use the charged language Thornton's brief employs.

¶35    The parties do not dispute that the evidence the State introduced constitutes "crime[s], wrong[s], or other act[s]" governed by rule 404(b). To be admissible under rule 404(b), "evidence of prior bad acts must be relevant and offered for a genuine, noncharacter purpose; furthermore, the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice." *State v. Lucero*, 2014 UT 15, ¶ 13, 328 P.3d 841; *see also State v. Decorso*, 1999 UT 57, ¶¶ 20–24, 993 P.2d 837 (reviewing the procedure for admission of prior bad acts evidence). The district court exercises its discretion in admitting rule 404(b) evidence. *Lucero,* 2014 UT 15, ¶ 11. However, the "proper exercise of that discretion" requires that the district court "must scrupulously examine the evidence before it is admitted." *Id.* (citation and internal quotation marks omitted).

¶36    The district court provided the following reasoning for admitting the evidence:

> I do find that it's relevant while it is quite prejudicial. I don't know that it's prejudicial to the effect of overmastering hostility, if we keep ourselves from name calling, like calling him a drug dealer or a pimp.
>
> The fact that he supplied drugs to this victim's mother and the fact that the victim's mother—that he had so much control in this household that he could get the victim's mother to prostitute herself, I think—and the fact that all of this is going on contemporaneous with the alleged sexual acts make this evidence not only relevant but admissible.
>
> I think the strength of the evidence you've got two witnesses testifying, a witness's testimony is direct evidence. The amount of time that passed between these acts is zero amount of time; they are happening contemporaneously. They may not be similar to being—you know, the prostitution and the drug dealing is not similar to the sexual acts but, again, I think it's necessary because I think as in [*State v. Losee*, 2012 UT App 213, 283 P.3d 1055,]

they're inextricably intertwined and it—they go to explain the power the defendant had over the victim and victim's mother in this household that these things were going on.

¶37    The district court revisited the rule 404(b) issue on the third day of trial, after the Utah Supreme Court issued its opinion in *State v. Verde*, 2012 UT 60, 296 P.3d 673. *Verde* identified and explored a particular challenge posed by rule 404(b) evidence—that "[e]vidence of prior misconduct often presents a jury with both a proper and an improper inference, and it won't always be easy for the court to differentiate the two inferences or to limit the impact of the evidence to the purpose permitted under the rule." *Id.* ¶ 16. *Verde* emphasized that when presented with rule 404(b) evidence, "the court should carefully consider whether it is genuinely offered for a proper, non-character purpose, or whether it might actually be aimed at sustaining an improper inference of action in conformity with a person's bad character." *Id.* ¶ 18; *see also State v. Ferguson*, 2011 UT App 77, ¶¶ 12–14, 250 P.3d 89 (holding that trial court's examination of rule 404(b) evidence "must be undertaken in a thoughtful and scrupulous fashion due to the important competing interests involved when other bad acts evidence is offered" and that "failure to do so constitutes an abuse of [the court's] discretion").

¶38    The district court, after considering *Verde*, reiterated its denial of Thornton's motion to exclude the evidence, explaining that the evidence

> is useful for the purposes of understanding the defendant's position of power and trust in the household, as well as the victim's behavior, her not telling right away when this happened and letting it go on for a few months as well as her fear afterward. For those purposes and those purposes alone, I am going to allow that evidence even under the heightened standard of evaluation that we see in the *Verde* case.

Thornton argues that this analysis failed to clear the analytical bar *Verde* described. Without opining on the ultimate admissibility of this evidence, we agree that the district court's analysis did not rise to the level of scrupulous examination required under these circumstances.

¶39   In many respects, the district court's rulings on the rule 404(b) evidence reflect the "care and precision" our case law requires. *See Lucero*, 2014 UT 15, ¶ 36. "[T]he scrupulous examination requirement is met when the trial court engages in [a] three- or four-step analysis on the record." *Id.* ¶ 37 (footnote omitted). The required steps include "analysis under rules 404(b), 402, and 403" of the Utah Rules of Evidence and, if raised, any "issue of conditional relevance under rule 104(b)" of the Utah Rules of Evidence. *Id.* ¶ 37 & n.62. Further, "[t]he court need not identify each of the *Shickles* factors in its analysis as long as we can discern that it made a sufficient inquiry under rule 403." *Id.* ¶ 37; *see State v. Shickles*, 760 P.2d 291, 295–96 (Utah 1988) (enumerating factors relevant to rule 403 analysis of bad acts evidence).[9] Here, the district court addressed the State's purpose for offering the drug and prostitution evidence under rule 404(b), determined relevance under rule 402, and used many of the *Shickles* factors to balance prejudice and probative value under rule 403.

¶40   Had the State sought to admit only one type of bad acts evidence—i.e., either the drug evidence or the prostitution evidence—the district court's examination may well have been sufficient. However, the district court took two separate categories of bad acts—drug dealing and encouragement of prostitution—and

---

9. The factors specifically enumerated in *State v. Shickles* are

> the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility.

760 P.2d 291, 295–96 (Utah 1988).

analyzed them as a single unit. In other words, the district court examined evidence of drug dealing and facilitating prostitution as if they were the same bad act and as if the same considerations applied to each equally. The problem with combining drug dealing with prostitution for rule 404(b) analysis becomes clear when viewed through the lens of the *Shickles* factors. *See Shickles*, 760 P.2d at 295–96.

¶41    Among the *Shickles* factors is the degree to which the evidence will rouse the jury to overmastering hostility. *Id*. at 296. In the context of a trial for aggravated sexual abuse of a child, the jury's reaction to evidence of drug dealing could be markedly different than its reaction to evidence of a defendant pressuring a drug-addicted woman into prostitution. Evidence that Thornton introduced Mother to prostitution could also provide a jury with a greater temptation to draw an improper inference about Thornton's propensity to commit the charged sex crimes than exists with the evidence of him supplying Mother with drugs. Lumping both types of bad acts into the same analytical bin prevented the district court from accounting for these differences and "carefully weigh[ing] the tendency toward proper and improper inferences from the other acts evidence in the context of the particular case." *State v. Labrum*, 2014 UT App 5, ¶ 28, 318 P.3d 1151; *see also State v. Lucero*, 2014 UT 15, ¶ 37, 328 P.3d 841 ("'The sum of an evidentiary presentation may well be greater than its constituent parts.'" (quoting *Huddleston v. United States*, 485 U.S. 681, 691 (1988))).

¶42    *Shickles* also requires the district court to assess the "need for the evidence" and the "efficacy of alternative proof." *See Labrum*, 2014 UT App 5, ¶ 25 (citation and internal quotation marks omitted). The State wanted the rule 404(b) evidence admitted to explain why Thornton was "allowed to dominate the household," "why [Mother] continued to let [Thornton] live there despite his poor treatment of her," and why Child believed Mother "would not protect her from [Thornton's] abuse." Had the district court examined each set of bad acts separately, it might have determined that the State's purported need for the evidence would have been satisfied by admission of the drug evidence alone. It may have similarly reached the conclusion that admission of the drug

evidence was an efficacious alternative to admission of the evidence of Thornton's role in Mother's prostitution. Whatever the ultimate outcome of the inquiry might have been, failure to analyze each category of bad acts separately did not comport with the district court's obligation to scrupulously examine the rule 404(b) evidence.

¶43    The district court also stated that the testimony regarding drugs and prostitution was "inextricably intertwined" with the charged crimes such that its exclusion would "leave holes in what is going on." Although the district court found the intertwining constituted a justification for admission of the evidence under rule 404(b), the Utah Supreme Court has instructed that when the charged crime and the prior act are "considered 'part of a single criminal episode,'" the evidence is inextricably intertwined and rule 404(b) is not implicated. *See Lucero*, 2014 UT 15, ¶ 14 n.7. It appears that the district court did not mean that Thornton's prior acts were actually part of the same criminal episode as the crimes for which he was charged but rather that they provided necessary context to understand how the crimes occurred and why Child did not report the crimes earlier.[10] This comports with the reasons the State gave for seeking admission of the rule 404(b) evidence but does not rise to the level of "inextricably intertwined" that would put the evidence beyond rule 404(b)'s reach. *See, e.g., United States v. Daly*, 974 F.2d 1215, 1216 (9th Cir. 1992) (finding, under Federal Rule of Evidence 404, evidence regarding a shoot-out inextricably

---

10. At least one federal court of appeals has identified concerns with using prior acts evidence to "complete a story" or "explain the circumstances" of an alleged criminal act under the analogous federal rule. *See United States v. Bowie*, 232 F.3d 923, 928 (D.C. Cir. 2000) ("The 'complete the story' definition of 'inextricably intertwined' threatens to override Rule 404(b). A defendant's bad act may be only tangentially related to the charged crime, but it nevertheless could 'complete the story' or 'incidentally involve' the charged offense or 'explain the circumstances.' If the prosecution's evidence did not 'explain' or 'incidentally involve' the charged crime, it is difficult to see how it could pass the minimal requirement for admissibility that evidence be relevant.").

intertwined with charge of being a felon in possession of a firearm); *State v. Dion*, 62 A.3d 792, 797 (N.H. 2013) (finding, under New Hampshire's version of the rule, phone records detailing a driver's phone conversations for thirty-seven minutes prior to fatal collision inextricably intertwined with negligent homicide charge).

¶44 The State argues that even if the district court erred by admitting the prior acts evidence, Thornton was not prejudiced by its admission. We disagree. Reversal based upon an error at trial is required "if a review of the record persuades the [appellate] court that without the error there was a reasonable likelihood of a more favorable result for the defendant." *State v. Tanner*, 2011 UT App 39, ¶ 10, 248 P.3d 61 (alteration in original) (citation and internal quotation marks omitted). "A reasonable likelihood of a more favorable outcome exists when the appellate court's confidence in the verdict is undermined." *State v. Whittle*, 1999 UT 96, ¶ 17, 989 P.2d 52. As articulated above, admission of evidence concerning Thornton's role in Mother's prostitution created an opportunity for the jury to use the evidence for the "obvious, illegitimate [purpose] of suggesting action in conformity with bad character." *See State v. Verde*, 2012 UT 60, ¶ 31, 296 P.3d 673.

¶45 Our confidence in the verdict is further undermined by the history of trials in this matter. At Thornton's first trial, the State stipulated to Thornton's motion in limine to exclude evidence of uncharged conduct. Nevertheless, Mother testified that she "was not a prostitute until [Thornton] moved into my house . . . and told me how to do it." The district court declared a mistrial because it was "very concerned" about the evidence in the "context [of] the allegations in this case."

¶46 Before the second trial, the State again agreed not to solicit testimony concerning Thornton's drug dealing or role in Mother's prostitution. That trial ended in a hung jury and mistrial. Before the third trial, the State argued that it should be permitted to introduce the rule 404(b) evidence because its absence in the second trial created a "huge gap." The State argued that "the jury needs to know what was actually going on in that home" and why Mother "did not kick him out" even though Thornton treated her

"extremely poorly" and "was not romantically involved with [Mother]." The State asserted that without an explanation the jury would "speculate and fill in what was going on" and that such speculation was "exactly what happened at the last trial and why it was a hung jury." Given the apparent importance of this evidence to the outcome of the second trial in the State's own view, admission of the evidence in Thornton's third trial can be reasonably viewed as affecting its outcome.

## CONCLUSION

¶47    The district court did not abuse its discretion in excluding evidence of Child's other sexual activity. We hold, however, that the district court did not engage in the scrupulous examination required by *State v. Verde*, 2012 UT 60, 296 P.3d 673, before admitting evidence under rule 404(b) of the Utah Rules of Evidence. We reverse Thornton's convictions and remand for further proceedings.

———